UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ALFRED PIRRI, JR.,

        Plaintiff,

-against-

LORI CHEEK, JOANNE RICHARDS, LOCKE RAPER, CHARLES KICKHAM & CHEEK'D, INC.,

        Defendants.

**Index No.**

**COMPLAINT**

**JURY TRIAL DEMANDED**

---

Plaintiff Alfred Pirri, Jr., by and through his undersigned attorneys, as and for his complaint against Defendants Lori Cheek, Joanne Richards, Locke Raper, Charles Kickham and Cheek'd, Inc., alleges as follows.

## NATURE OF ACTION

1.    This is an action for (1) a declaration of invalidity of U.S. Patent No. 8,543,465 due to inequitable conduct, (2) unjust enrichment under New York common law, (3) breach of a medical professional's fiduciary duty of confidentiality under New York common law, (4) misappropriation of trade secrets under New York common law, (5) unfair competition under New York common law, (6) conversion under New York common law, and (7) fraud under New York common law.

## PARTIES

2.    Plaintiff Alfred Pirri, Jr. is a person residing at 131 Glen Drive, Ridge, New York.

3.    Upon information and belief, Defendant Lori Cheek is a person residing at 104 Forsyth Street, New York, New York.

4.    Upon information and belief, Defendant Charles Kickham is a person residing at 260 Elizabeth Street, New York, New York.

1

5. Upon information and belief, Defendant Locke Raper is a person residing at 140 East 46th Street, New York, New York.

6. Defendant Cheek'd, Inc. is a New York Domestic Business Corporation with a principal place of business at 104 Forsyth Street, New York, New York.

7. Upon information and belief, Defendant Joanne Richards is a licensed clinical social worker who resides at 16010 E. Tumbleweed Drive, Fountain Hills, Arizona.

8. Defendant Richards formerly treated patients at a facility called Pederson Krag Center Inc., located at 11 Route 111, Smithtown, New York.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 2201 (Creation of Remedy), 28 U.S.C. § 1338 (Patents), 28 U.S.C. § 1331 (Federal Question), and 28 U.S.C. § 1367 (Supplemental Jurisdiction).

10. This Court has personal jurisdiction over Defendants Lori Cheek, Charles Kickham, Locke Raper and Cheek'd, Inc. because each of them is a resident of New York County.

11. This Court has personal jurisdiction over Defendant Joanne Richards because she committed tortious acts in New York State against a New York resident while she was residing in the State of New York and while she was employed as a licensed clinical social worker at Pederson Krag Center Inc., located at 11 Route 111, Smithtown, New York.

12. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 for the same reasons that personal jurisdiction over Defendants in New York is proper and because a substantial part of the events giving rise to the claims herein occurred in this Judicial District.

## FACTS COMMON TO ALL CLAIMS

13. Defendant Lori Cheek presents herself to the public as a successful entrepreneur, who seemingly conceived a novel idea in 2008 and then patented that idea and proceeded to create a successful dating website, app and business called "Cheekd".

14. Defendant Cheek aggressively promoted the idea – which she later marketed as "Online Dating in Reverse" – and was able to obtain funding to start her business.

15. While promoting the novel idea, Defendant Cheek participated in an episode of the popular cable television show "Shark Tank" where entrepreneurs try to pitch their ideas to venture capitalists to obtain funding.

16. Because of the "Online Dating in Reverse" idea, Lori Cheek became an internet and social media celebrity, hosting her own Facebook, Instagram and Twitter Pages and even giving an interview to Oprah Winfrey.

17. By all accounts, Lori Cheek seems to be one of the many success stories that one sees in this day and age of social media. Combine a unique idea with sufficient funding provided by numerous investors, competent technologically-savvy professionals and one can become an overnight success.

18. But, unfortunately for Defendant Cheek, the image that she presented to the public hid an inconvenient truth. The idea upon which she based her entire business and celebrity was not hers.

19. In the mid-2000's, Plaintiff Alfred Pirri Jr. was a single man living in the New York tri-state area, who keenly noted through his personal experiences that, although there were plenty of single people living in New York City, there were very few efficient ways a person could use to meet single people in order to date them.

20. A person could meet people in a bar, but bars are not the best place to meet

people. Bars are noisy. Conversations are awkward and superficial and there is always the overwhelming competition from other would-be suitors. In a crowded bar, a person could be standing 10-feet from the person's future spouse and never know it.

21. During the mid-2000s, online dating was added to arsenal those who were seeking to meet people upon subscribing to dating websites, like Match.com or Yahoo Personals.

22. However, online dating platforms had many flaws. One could scroll through dozens and dozens of profiles to try and meet people but reviewing the electronic profile of potential dates was risky and impersonal. People were notoriously untruthful about their age or backgrounds, or posted pictures of themselves that looked nothing like them.

23. Plus, a person would have to go through several email exchanges and a live date or two to discover the disappointing truth. Each one of these encounters would take place over the course of a week or two (or maybe months) and involve a substantial investment of time and emotional energy. To Mr. Pirri, the entire internet dating process seemed to work backwards.

24. Mr. Pirri thought to himself, that it would be much more effective if the online dating process could be reversed, that is to meet a person first to see what they really looked or acted like, so that a person could ascertain such intangible, ethereal qualities such as the way they walked or the manner in which they engaged in a casual conversation.

25. Only after this initial, face-to-face encounter (when one's own instincts told a person that there was chemistry and thus a reason to pursue the other person) would someone even need to go through the process of learning about that new love interest's background and profile. But, how would he accomplish these goals, Mr. Pirri thought to himself, and how would a new process be any better than, say, going to a bar, or signing up for online dating?

26. Based on his past experiences with handing out business cards in professional

settings, Mr. Pirri knew that business cards were a very casual but effective way of introducing himself to a potential client or employer and providing some means of allowing them to remember him and contact him if they chose to do so.

27. What if, instead of sitting in front of a computer looking for people to date, a person could simply meet people on the street, at a meeting, or at a ballgame and if a person saw someone the person liked, the person could hand out his/her card to them with some information about him/herself? This seemed a lot less intrusive and intimidating than simply going up to a person and forcing a conversation on them.

28. But then, Mr. Pirri thought, you were staking your entire fate on a standard business-size card, which measures no more than 3.5 x 2 inches – hardly enough space to tell your life story or even describe who your favorite sports team was.

29. That is, unless, the business-size card was somehow a key to unlocking additional information, and that's when the idea occurred to Mr. Pirri. What if the business-size card contained some sort of code that the recipient could enter onto a website which would unlock a much more extensive and entertaining profile of the person passing out the card.

30. To make sure that the recipient remembered the person passing out the card enough to even *want to* enter the code onto a website in the first place, the card could contain some witty quotes or passages that recalled the person passing out the card.

31. To make money – because who would want to buy such an idea if it could not generate money – the person passing out the card would pay a fee to create a profile on the website and the cards and the recipient would pay money for accessing the profiles unlocked by the code on the business-size cards that s/he had received.  Mr. Pirri had finally solved the problem that had been bothering him about dating.

32. After conceiving these novel ideas for his dating website application, Mr. Pirri committed his ideas on paper before a notary public on September 18, 2006.

33. On October 27, 2006, Mr. Pirri also retained services of a patent attorney who conducted a patentability search to ensure that his idea is, indeed, novel and, as such, could be patented.

34. The patentability search report dated January 24, 2007 confirmed that no identical nor similar ideas were ever disclosed in registered patents, pending patent applications and non-patent publications.

35. After doing research to prepare a business plan to patent his invention and fund a start-up based on his ideas, Mr. Pirri was forced to put his plans on hold due to some family health and priority issues.

36. To cope with his family issues, Mr. Pirri decided that he needed to see a licensed professional to help him through these issues. This occurred in the Fall of 2008.

37. Since he was living in the area, Mr. Pirri decided to seek counseling at the mental health facility at Pederson Krag Center Inc., located at 11 Route 111, Smithtown, New York.

38. It was at Pederson Krag that Mr. Pirri first met Defendant Richards and decided to retain her services as a licensed clinical social worker.

39. Defendant Richards would treat Mr. Pirri from September 2008 to May 2013.

40. During their first few meetings, they spoke about Mr. Pirri's background, including Mr. Pirri's aspirations and future plans.

41. It was in this context that Mr. Pirri first provided a detailed disclosure of his idea for a dating website and app to Defendant Richards, which he described to her as "online dating in reverse" – the exact description used by Defendant Cheek on her "Shark Tank" appearance.

Before Mr. Pirri disclosed his idea to Defendant Richards, he asked and had her full assurance that she would not disclose the idea to anyone.

42. Unbeknownst to Mr. Pirri, and in violation of her ethical and fiduciary duties as a medical professional to maintain the confidentiality of his communications with her, Defendant Richards for some reason disclosed detailed information about Mr. Pirri's idea for a dating website and app to a social acquaintance.

43. In subsequent sessions with Mr. Pirri (at or around October 2008), Defendant Richards confessed to him that she had disclosed his idea for a dating website and app to that social acquaintance, who Defendant Richards described as an architect and interior designer who was always looking for the next new idea. That social acquaintance was no other than Defendant Lori Cheek, one of the so-called inventors of the Cheek'd dating website and app. Defendant Richards also went on to say that Defendant Cheek thought that Mr. Pirri's idea was a great idea.

44. Mr. Pirri was furious. Not only had Defendant Richards breached her sacred duty of confidentiality to him as her patient, but she disclosed the very ideas that he had originated and upon which he planned to build a career.

45. When Mr. Pirri confronted Defendant Richards on her gross violations of his trust and the potentially catastrophic consequences of her actions in disclosing his ideas without some guarantee that someone would not steal his ideas, Defendant Richards constantly kept assuring Mr. Pirri that Defendant Cheek would not make use of his idea, making such assurances as "Don't worry, she's not going to do anything with your idea,", "She just thought it to be a great idea,", "She isn't going to pursue it," or "Nothing to worry about."

46. Lulled into this false sense of security, Mr. Pirri in or around August 2009 started discussing his dating website and app idea again with Defendant Richards with the idea of

starting a business about it. Defendant Richards' response was "I wouldn't do that. It's just going to be very stressful for you. Just forget about that idea."

47. Unbeknownst to Mr. Pirri, this recommendation, while represented as professional advice meant to treat Mr. Pirri, was a pretext meant to assist Defendant Cheek in completing her theft of Mr. Pirri's idea and to prevent Mr. Pirri from discovering Defendant Cheek's theft and Defendant Richards' role in that theft.

48. Because of his trust in her as his social worker, Mr. Pirri was talked out of maintaining any sort of disciplinary proceedings against Defendant Richards and any kinds of legal actions against her and Defendant Cheek.

49. Unfortunately, Mr. Pirri's trust was misguided.

50. Soon after Defendant Richards first talked Mr. Pirri out of maintaining any legal or disciplinary actions, and unbeknownst to Mr. Pirri, Defendants Cheek, Kickham, Raper and Cheek'd, Inc., took Mr. Pirri's idea for a dating website and app and claimed it as their own.

51. In a patent application filed with the United States Patent and Trademark Office ("USPTO"), these Defendants all claimed to have been the inventors of the dating website and app that Mr. Pirri had invented, when they full-well knew that they were not the inventors. A copy of the 37 CFR 1.76 Application Data Sheet, in which Defendants Cheek, Kickham, Raper and Cheek'd, Inc. each claimed to be inventors of Mr. Pirri's invention is attached as Exhibit A.

52. That application would eventually issue as U.S. Patent No. 8,543,465; a copy of which is attached as Exhibit B.

53. U.S. Patent No. 8,543,465 disclosed the very invention that Mr. Pirri had conceived, that Mr. Pirri had committed to paper before a notary public more than two years before Defendants Cheek, Kickham, Raper and Cheek'd, Inc. ever submitted their fraudulent

application to the USPTO, that Mr. Pirri had disclosed in confidence to Defendant Richards, and that Defendant Richards had improperly disclosed to Defendant Cheek in violation of her fiduciary duties to Mr. Pirri.

54. Mr. Pirri had no idea that this had happened because he had placed his trust in Defendant Richards that no one to whom she disclosed his invention would make use of that invention – that is, until on or about July of 2015 when, while watching re-runs of the popular TV show Shark Tank, he saw Defendant Lori Cheek introducing Mr. Pirri's invention as her own to the hosts of the show and to millions of viewers around the world.

55. To add insult to injury, Defendant Cheek even described "her" invention with the exact same phrase with which Mr. Pirri described his invention to Defendant Richards – "online dating in reverse".

56. Since Mr. Pirri made that discovery, Defendants Cheek, Kickham, Raper and Cheek'd, Inc. have continued on with their deception of the public by giving interviews, recruiting investors, developing a business, and building a brand around Mr. Pirri's idea – all the while failing to disclose to the world that the idea had been stolen from Mr. Pirri.

57. As soon as Mr. Pirri witnessed Defendant Cheek shamelessly deceiving the investors, the United States Patent and Trademark Office, and the entire nation into believing that she was a true inventor of the novel ides, Mr. Pirri decided to take immediate action.

58. Mr. Pirri immediately contacted Defendant Richards, who, at that time, moved to the State of Arizona and continued her professional career there. During the telephone conversation with Defendant Richards, Mr. Pirri once again reminded Defendant Richards of her breach of her duty of confidentiality and pointed out that, Defendant Cheek's success was a direct consequence of Defendant Richard's breach of her duty to maintain confidentiality of the

information obtained by her during the sessions with her patients.

59. Defendant Richards concluded her conversation with Mr. Pirri by promising to reach out to Defendant Cheek to resolve the situation. However, Mr. Pirri never heard from Defendant Richards ever again.

60. Since those conversations, the harm to Mr. Pirri has increased because Defendants have continued to use Mr. Pirri's ideas to develop similar social networking applications and websites, including a website/application called "Networkd".

## FIRST CLAIM FOR RELIEF
(DECLARATION OF INVALIDITY OF U.S. PATENT NO. 8,543,465)

61. Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

62. Defendants Cheek, Kickham, Raper and Cheek'd filed a patent application that issued as U.S. Patent No. 8,543,465.

63. Defendants Cheek, Kickham, Raper and Cheek'd, Inc. had a duty to prosecute their patent application before the USPTO with candor, good faith, and honesty.

64. Defendants Cheek, Kickham, Raper and Cheek'd, Inc. knew that they did not invent the novel method disclosed in U.S. Patent No. 8,543,465 because they knew that the idea came from Defendant Richards through her unlawful disclosure of Plaintiff's confidential communications.

65. Despite this knowledge and despite their duty to prosecute their patent application with candor, good faith, and honesty, Defendants Cheek, Kickham, Raper and Cheek'd, Inc. applied for a United States patent in which they submitted sworn statements to the USPTO attesting to the fact that they were the inventors of U.S. Patent No. 8,543,465, when they in fact were not.

66. Defendants' sworn statements concerning inventorship were false because they knew that they did not invent the novel method disclosed in U.S. Patent No. 8,543,465.

67. Defendants' statements to the USPTO were material because the USPTO would not have issued U.S. Patent No. 8,543,465 had it known that the inventor information was false.

68. Based on Defendants' direct knowledge to the contrary and based on their awareness that the USPTO would not have granted their application if it had known that the inventor information was false, Defendants' act of submitting sworn statements to the USPTO attesting to their inventorship evidenced a clear intent to deceive the USPTO.

69. There exists a substantial and actual controversy because Defendants have monetized and continue to monetize U.S. Patent No. 8,543,465 to the exclusion of Plaintiff.

70. Plaintiff is therefore entitled to a declaration that U.S. Patent No. 8,543,465 is invalid based on Defendants' inequitable conduct.

## SECOND CLAIM FOR RELIEF
(UNJUST ENRICHMENT)

71. Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

72. Plaintiff conceived of the idea that is the subject matter of U.S. Patent No. 8,543,465.

73. Plaintiff communicated that idea to Defendant Richards under a fiduciary duty owed by Defendant Richards to Plaintiff to not disclose any communications to third parties.

74. Defendant Richards proceeded to breach her fiduciary duty to Plaintiff by disclosing that idea to Defendant Cheek

75. Based on information and belief, Defendant Cheek then communicated that idea to Defendants Kickham, Raper and Cheek'd, Inc.

11

76.     Based on this unlawful disclosure of Plaintiff's confidential communications, Defendants Cheek, Kickham, Raper and Cheek'd were able to obtain U.S. Patent No. 8,543,465 and to monetize that patent.

77.     Plaintiff was the only person entitled to obtain U.S. Patent No. 8,543,465 and to monetize that patent.

78.     Defendants Cheek, Kickham, Raper and Cheek'd, Inc. were therefore unjustly enriched at Plaintiff's expense.

79.     It is against equity and good conscience to permit Defendants to retain any rights to U.S. Patent No. 8,543,465 or any rights to monetize that patent.

80.     Plaintiff is therefore entitled to full restitution and/or disgorgement of Defendants' ill-gotten profits.

## THIRD CLAIM FOR RELIEF
### (BREACH OF THE FIDUCIARY DUTY OF CONFIDENTIALITY)

81.     Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

82.     Defendant Richards is a licensed clinical social worker.

83.     Defendant Richards treated Plaintiff as her patient at the Pederson Krag Center Inc. between September 2008 and May 2013.

84.     Based on their relationship as licensed clinical social worker and patient, Defendant Richards owed Plaintiff a fiduciary duty, which included a duty to not disclose to third parties any communications she learned from Plaintiff during her treatment of Plaintiff and a duty to disclose any breaches of that duty to Plaintiff.

85.     During a series of sessions held in October of 2008, Plaintiff disclosed to Defendant Richards his idea for a dating website and app.

86. Defendant Richards breached her fiduciary duty to Plaintiff by disclosing Plaintiff's communications concerning his idea for a dating website and app to Defendant Cheek on or about October of 2008.

87. Upon information and belief, Defendant Cheek then communicated Plaintiff's idea to Defendants Kickham, Raper and Cheek'd, Inc.

88. This unlawful disclosure by Defendant Richards provided Defendants Cheek, Kickham, Raper and Cheek'd with all the information necessary to apply for, and obtain issuance of, U.S. Patent No. 8,543,465.

89. Plaintiff's idea for a dating website and app belonged to Plaintiff exclusively such that only Plaintiff had the right to apply for a United States patent based on that idea.

90. Because of Defendant Richards' breach of fiduciary duty, Plaintiff has been deprived of the benefits of a patent for his idea and the ability to monetize that patent.

91. Because of Defendant Richards' breach of fiduciary duty, Plaintiff has been harmed in an amount to be established at trial, but in any event no less than $1,000,000.

## FOURTH CLAIM FOR RELIEF
### (MISAPPROPRIATION OF TRADE SECRETS)

92. Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

93. Plaintiff possessed a trade secret in his idea for an online dating website and app.

94. Plaintiff took measures to protect the confidentiality of that trade secret by never disclosing that information except subject to reasonable confidentiality restrictions.

95. Plaintiff disclosed his trade secret in the online dating website and app to Defendant Richards during his sessions with Defendant Richards.

96. Because his disclosure was made while he was being treated by Defendant

13

Richards and Plaintiff understood that licensed clinical social workers such as Defendant Richards are bound by a duty of confidentiality, Plaintiff had a reasonable expectation that his disclosure to her would be kept confidential.

97. Defendant Richards disclosed Plaintiff's trade secret to Defendant Cheek.

98. Upon information and belief, Defendant Cheek disclosed Plaintiff's trade secret to Defendants Kickham, Raper and Cheek'd, Inc.

99. Defendants Cheek, Kickham, Raper and Cheek'd, Inc. proceeded to use Plaintiff's trade secret that had been obtained in breach of a duty of confidentiality to apply for, and obtain issuance, of U.S. Patent No. 8,543,465 and to monetize that patent.

100. Because the rights to apply for a patent to his online dating website and app and the right to monetize that idea and patent belonged exclusively to Plaintiff, Defendants' misappropriation of Plaintiff's trade secret has harmed Plaintiff in an amount to be established at trial, but in any event no less than $1,000,000.

## FIFTH CLAIM FOR RELIEF
(UNFAIR COMPETITION)

101. Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

102. The idea for Plaintiff's online dating website and app was conceived by Plaintiff.

103. Plaintiff's idea was the product of his skill and labor.

104. Defendants stole that idea from Plaintiff and used it to apply for, and obtain issuance of, the invention embodied in U.S. Patent No. 8,543,465, and to monetize that patent.

105. Because the rights to apply for a patent to his online dating website and app and the right to monetize that idea and patent belonged exclusively to Plaintiff, Defendants' misappropriation of Plaintiff's idea has harmed Plaintiff in an amount to be established at trial,

but in any event no less than $1,000,000.

## SIXTH CLAIM FOR RELIEF
### (CONVERSION)

106.  Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

107.  Plaintiff had a possessory right and interest in the idea for the dating website and app disclosed in U.S. Patent No. 8,543,465.

108.  By obtaining U.S. Patent No. 8,543,465, Defendants have excluded Plaintiff from any rights to the dating website and app and thus have interfered with Plaintiff's rights.

109.  As a result of Defendants' illegal conversion of Plaintiff's rights, Plaintiff has suffered damages in an amount to be established at trial, but in any event no less than $1,000,000.

## SEVENTH CLAIM FOR RELIEF
### (FRAUD)

110.  Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

111.  Plaintiff created the idea for the dating website and app disclosed in U.S. Patent No. 8,543,465.

112.  Defendant Richards is a licensed clinical social worker.

113.  Defendant Richards treated Plaintiff as her patient at the Pederson Krag Center Inc. between September 2008 and May 2013.

114.  Based on their relationship as licensed clinical social worker and patient, Defendant Richards owed Plaintiff a fiduciary duty, which included a duty to not disclose to third parties any communications she learned from Plaintiff during her treatment of Plaintiff and

a duty to disclose any breaches of that duty to Plaintiff.

115.    During a series of sessions held in October of 2008, Plaintiff disclosed to Defendant Richards his idea for a dating website and app.

116.    Defendant Richards disclosed Plaintiff's communications concerning his idea for a dating website and app to Defendant Cheek on or about October of 2008.

117.    Defendant Richards knew that Defendant Cheek was taking steps to apply for a patent for Plaintiff's idea and to claim it as her own to the exclusion of Plaintiff's rights.

118.    Defendant Richards knew that Defendant Cheek was also taking steps to build a business on Plaintiff's idea.

119.    Because Defendant Richards was Plaintiff's social worker and because Defendant Richards was the individual who disclosed Plaintiff's idea to Defendant Cheek without Plaintiff's consent, Defendant Richards had a duty to disclose to Mr. Pirri that Defendant Cheek was taking steps to steal Plaintiff's ideas and to build a business on Plaintiff's idea so that Plaintiff could at least take steps to stop that conduct.

120.    Defendant Richards failed to disclose to Plaintiff that Defendant Cheek was taking steps to steal Plaintiff's idea and to build a business on that idea. In fact, Defendant Richards made false representations to Plaintiff that Defendant Cheek was not taking steps to steal Plaintiff's invention and to build a business on Plaintiff's idea.

121.    Because of Defendant Richards' failure to disclose the fact that Defendant Cheek was taking steps to steal Plaintiff's idea and to build a business on that idea and because of her intentional misrepresentation of these facts, Plaintiff was wrongfully prevented from obtaining rights to his idea and to build a business on that idea such that Plaintiff has suffered damages in an amount to be established at trial, but in any event no less than $1,000,000.

**WHEREFORE**, Plaintiff prays for judgment against Defendants as follows:

1. Declaring that U.S. Patent No. 8,543,465 is invalid based on Defendants' false statements to the USPTO concerning inventorship;

2. Shutting down Defendants' Cheek'd website based on Defendants' unjust enrichment at Plaintiff's expense;

3. Enjoining Defendants from making any statements claiming ownership of U.S. Patent No. 8,543,465 or any of the ideas or inventions disclosed in that patent;

4. Disgorging all of Defendants' profits based on Defendants' unjust enrichment at Plaintiff's expense;

5. Ordering all Defendants to pay restitution to Plaintiff based on their unjust enrichment at Plaintiff's expense;

6. Ordering all Defendants to pay compensatory and punitive damages due to their tortious conduct committed against Plaintiff in an amount no less than $1,000,000;

7. Awarding Plaintiff his costs and reasonable attorneys' and investigatory fees, expenses, costs, together with pre-judgment interest.

8. Awarding Plaintiff such other and further relief as the Court may deem just and proper.

Dated: New York, New York
September 18, 2017

Respectfully submitted,

   /Oleg A. Mestechkin/
Oleg A. Mestechkin, Esq. (OM4108)
**MESTECHKIN LAW GROUP P.C.**
200 Vesey Street, 24th Floor
New York, NY 10281
Tel. (212) 256-1113
Fax. (646) 358-4906
om@lawmlg.com

*Attorneys for Plaintiff Alfred Pirri Jr.*